**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| COLUMBIA HOSPITAL AT MEDICAL CITY DALLAS SUBSIDIARY, L.P. D/B/A MEDICAL CITY DALLAS; COLUMBIA RIO GRANDE HEALTHCARE, L.P. D/B/A RIO GRANDE REGIONAL HOSPITAL; KPH-CONSOLIDATION, INC. D/B/A HCA HOUSTON HEALTHCARE NORTH CYPRESS; ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP D/B/A ST. DAVID'S ROUND ROCK MEDICAL CENTER; METHODIST HEALTHCARE SYSTEM OF SAN ANTONIO, LTD., L.L.P. D/B/A METHODIST HOSPITAL STONE OAK, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. |
| Claimants, | ) ) |
| v. | ) ) ) |
| BLUE CROSS AND BLUE SHIELD OF ALABAMA, | ) ) ) |
| Respondent. | ) |

<u>**PLAINTIFFS' ORIGINAL COMPLAINT**</u>

COMES NOW Plaintiffs, Columbia Hospital at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas; Columbia Rio Grande Healthcare, L.P. d/b/a Rio Grande Regional Hospital; KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare North Cypress; St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's Round Rock Medical Center; Methodist Healthcare System of San Antonio, Ltd., L.L.P. d/b/a Methodist Hospital Stone Oak (collectively, "Plaintiffs" or "Hospitals"), by and through their attorneys of records, Polsinelli, PC, and complain of Defendant, Blue Cross and Blue Shield of Alabama ("Defendant" or "BCBS AL") as follows:

<u>**PLAINTIFFS' ORIGINAL COMPLAINT**</u>                                    **PAGE 1**

### STATEMENT OF FACTS

### A.    PARTIES

1.      Plaintiff Columbia Hospital at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas ("MC Dallas") is a Texas limited partnership. Columbia Hospital at Medical City of Dallas Subsidiary, L.P. has two partners: Columbia North Texas Subsidiary GP, LLC, a Texas limited liability company; and Medical City Dallas Partner, LLC, a Delaware limited liability company. Columbia North Texas Subsidiary GP, LLC and Medical City Dallas Partner, LLC both have the same sole member: Columbia North Texas Healthcare System, L.P. ("CNTHS"), a Texas limited partnership. Accordingly, Columbia Hospital at Medical City of Dallas Subsidiary, L.P.'s, Columbia North Texas Subsidiary GP, LLC's, and Medical City Dallas Partner, LLC's citizenship depend on CNTHS's citizenship. CNTHS has two partners: North Texas General, L.P., a Texas limited partnership; and Columbia-SDH Holdings, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee. North Texas General, L.P. has three partners: NTGP, LLC, a Texas limited liability company; GalTex, LLC, a Texas limited liability company; and Columbia-SDH Holdings, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee. Both NTGP, LLC and GalTex, LLC have the same sole member: Columbia-SDH Holdings, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee. By and through its partners, Columbia Hospital at Medical City of Dallas Subsidiary, L.P. is a citizen of Tennessee and Delaware.

2.      Plaintiff Columbia Rio Grande Healthcare, L.P. d/b/a Rio Grande Regional Hospital ("Rio Grande") is a Delaware limited partnership. Columbia Rio Grande Healthcare, L.P. has two partners: Rio Grande Regional Hospital, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; and Columbia-SDH Holdings, Inc., a Delaware

corporation with its principal place of business in Davidson County, Tennessee. By and through its partners, Columbia Rio Grande Healthcare, L.P. is a citizen of Texas, Tennessee, and Delaware.

3.      Plaintiff KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare North Cypress ("North Cypress") is a Texas corporation with its principal place of business in Harris County, Texas. KPH-Consolidation, Inc. is a citizen of Texas.

4.      Plaintiff St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's Round Rock Medical Center ("Round Rock") is a Texas limited partnership. St. David's has five partners: Round Rock Hospital, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee; Columbia-SDH Holdings, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee; COL-NAMC Holdings, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; St. David's Foundation, a Texas corporation with its principal place of business in Travis County, Texas; and Georgetown Healthcare System, Inc., a Texas corporation with its principal place of business in Williamson County, Texas. By and through its partners, St. David's Healthcare Partnership, L.P., LLP is a citizen of Texas, Tennessee, and Delaware.

5.      Plaintiff Methodist Healthcare System of San Antonio, Ltd., L.L.P. d/b/a Methodist Hospital Stone Oak ("Stone Oak") is a Texas limited partnership. Methodist has six partners: Columbia/HCA Healthcare Corporation of Central Texas, a Texas corporation with its principal place of business in Davidson County, Tennessee; San Antonio Regional Hospital, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; W & C Hospital, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; Village Oaks Medical Center, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; MGH Medical, Inc., a Texas corporation with its principal place of

business in Davidson County, Tennessee; and Methodist Healthcare Ministries of South Texas, Inc., a Texas corporation with its principal place of business in Bexar County, Texas. By and through its partners, Methodist Healthcare System of San Antonio, Ltd., L.L.P. is a citizen of Texas and Tennessee.

6.    Defendant BCBS AL is a corporation organized under the laws of the State of Alabama doing business in Texas. BCBS AL is a citizen of Alabama. BCBS AL does not maintain a regular place of business in Texas and does not have a designated agent for service of process in Texas. This lawsuit arises from BCBS AL's business in Texas, and it may therefore be served through the Texas Secretary of State pursuant to Tex. Civ. Prac. & Rem. Code § 17.044(b). BCBS AL's principal place of business is located at 450 Riverchase Parkway East, Birmingham, Alabama 35244. BCBS AL is a licensee of the Blue Cross and Blue Shield Association ("BCBSA") and is licensed to offer Blue Cross and Blue Shield ("BCBS") branded health plans in the State of Alabama. As explained below, BCBS AL's health insurance subscribers are not confined to the State of Alabama and routinely receive hospital services in other states, including Texas, for which BCBS AL is responsible.

## B.    JURISDICTION AND VENUE

7.    This Court has personal jurisdiction over BCBS AL because BCBS AL conducts substantial business in Texas, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here. Further, as explained below, BCBS AL is an "Affiliate" of BCBSA and a "Payer" as defined in the Agreements (defined below). Specifically, Part III(H) of the Agreements allows "Affiliates" of BCBSA and "Payers" access to the benefits of the Agreements (namely, in-network reimbursement rates that are discounts off of the Hospitals' billed charges), provided that the "Affiliates" and "Payers" comply with the terms and provisions

of the Agreements. As such, by accessing the benefits of the Agreements, BCBS AL agreed to comply with their terms, including the requirement that the Agreements be governed by Texas law. Further, BCBS AL insures and/or administers health plans that cover Texas residents. Upon information and belief, each of the Subscribers (defined below) resides in the State of Texas. Each of the Subscribers received medical services in the State of Texas. BCBS AL issued and/or administered these health plans to/for Texas residents knowing of the possibility of having to resolve disputes under the Agreements based on Texas law. BCBS AL therefore has sufficient contacts with the State of Texas.

8.      This Court has subject-matter jurisdiction because this dispute is between citizens of different states (Plaintiffs are citizens of Texas, Tennessee, and Delaware, and BCBS AL is a citizen of Alabama) and involves an amount in controversy greater than $75,000. This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert a claim under ERISA, 29 U.S.C. §§ 1001, et seq., that arises under the laws of the United States. Further, this Court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because, as described below, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district. Specifically, the healthcare claims and appeals of such claims were provided to Blue Cross and Blue Shield of Texas ("BCBSTX") for initial processing and then subsequently forwarded by BCBSTX to BCBS AL, as described in additional detail below. BCBSTX is headquartered in the Northern District of Texas. As such, BCBSTX partially processed these claims and provided notices of their adjudication on behalf of BCBS AL in the Northern District of Texas, thus making venue proper under 28 U.S.C. § 1391(b)(2). Venue is also

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **PAGE 5**

proper under 29 U.S.C. § 1132(e)(2) because Plaintiffs have asserted a claim under ERISA, and the administration of these health plans, for purposes of the claims at issue, took place at least in part by BCBSTX at its headquarters, which is located in the Northern District of Texas. Further, at least some portion of the breach of the health plans at issue took place in this judicial district, as BCBS AL denied reimbursement for medical services rendered in the Northern District of Texas.

## C.    FACTUAL BACKGROUND

### I.    THE AGREEMENTS AND THE BLUECARD PROGRAM

10.    Plaintiffs are acute care hospitals in Texas. Plaintiffs provide medically necessary services to their local communities.

11.    As part of their provision of medically necessary services to their local communities, Plaintiffs contracted with non-party BCBSTX through the following agreements:

 a. Plaintiff MC Dallas, by and through its disclosed agent, North Texas Division, Inc., contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016, as amended) ("North Texas Agreement");

 b. Plaintiffs Rio Grande and North Cypress by and through their disclosed agent, Gulf Coast Division, Inc., contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016, as amended) ("Gulf Coast Agreement");

 c. Plaintiff Round Rock contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016, as amended) ("St. David's Agreement"); and

d.  Plaintiff Stone Oak contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016, as amended) ("Methodist Agreement," and collectively with the North Texas Agreement, the Gulf Coast Agreement, and the St. David's Agreement, the "Agreements").[1]

12.  The Agreements specify the terms and conditions under which Plaintiffs will treat patients with BCBS health plans, referred to in the Agreements and herein as "subscribers,"[2] and be reimbursed for that treatment. Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary services to a subscriber.

13.  The Agreements are far broader than the relationship between just Plaintiffs, BCBSTX, and subscribers enrolled in a BCBSTX health plan, however. The Agreements also cover treatment that Plaintiffs provide through the "BlueCard Program" to any subscribers enrolled in any BCBS health plan, including subscribers who are insured by another state's BCBSA licensee. BCBS AL is the BCBSA licensee for the State of Alabama, and when the patients at issue in this dispute who were insured by BCBS AL (the "Subscribers") received medical care at the Hospitals in Texas, the claims associated with such care were properly initially submitted to BCBSTX (the BCBSA licensee for the State of Texas) for processing in accordance with the terms of BCBSTX's contracts with the Hospitals, which are the Agreements. BCBS AL is bound by the Agreements in multiple ways: (a) by reason of its status as an "Affiliate" of BCBSA; (b) as a "Payer" under the Agreements; and (c) by its participation in the BlueCard Program, which is explained in more detail below.

---

[1] The Agreements contain confidentiality provisions that prevent Plaintiffs from attaching them to this Complaint. The Agreements will be produced pursuant to a valid discovery request once a protective order has been entered.

[2] When used generally herein, the term "subscribers" is not capitalized. When the term is used to refer to the specific patients at issue in this dispute, the defined term "Subscribers" is used.

14.     The Agreements provide that (a) Plaintiffs will provide services to subscribers of out-of-state BCBS plans through the BlueCard Program; (b) such out-of-state BCBS plans, as "Affiliates" of BCBSA and as "Payers" under the Agreements, will access the discounted rates set forth in the Agreements when Plaintiffs provide services to their subscribers through the BlueCard Program; and (c) the out-of-state BCBS plans, as "Affiliates" of BCBSA and as "Payers" under the Agreements, will be bound by the terms and obligations of the Agreements when Plaintiffs provide services to their subscribers through the BlueCard Program, which includes the obligation to pay claims in accordance with the Agreements.

15.     The Agreements specifically allow "Affiliates" of BCBSA and particularly, other BCBS plans through the BlueCard Program, access to the benefits of the Agreements (namely, in-network reimbursement rates), provided the "Affiliates" comply with all terms and provisions of the Agreements. Further, the Agreements specifically provide that Plaintiffs will provide covered services to subscribers of "Affiliates," which includes BCBS AL, as set forth in and subject to the terms and conditions of the Agreements.

16.     BCBS AL, by its conduct in processing the claims, issuing partial payment on some of the claims, and authorizing the care provided in some of the claims, did in fact access and rely upon the Agreements. As an "Affiliate" of BCBSA which has accessed and relied upon the Agreements, and acted as an assignee of the Agreements, BCBS AL is bound by the terms of the Agreements for the services at issue provided by Plaintiffs to the Subscribers.

17.     BCBS AL, by participating in the BlueCard Program, also agreed to be a "Payer" under the Agreements.

18.     The Agreements provide that BCBSTX and any "Payer," which includes entities that are financially responsible for the payment of services under a health plan administered by

BCBSTX and with which BCBSTX directly or indirectly contracts, are bound by the Agreements, including their provisions concerning the payment of claims.

19.    The definition of "Payer" in the Agreements includes participants in the BlueCard Program, like BCBS AL, because, under the BlueCard Program, BCBS AL is financially responsible for the claims submitted for services provided to its subscribers, and BCBS AL partially delegates its duties as health plan administrator to BCBSTX for the processing of BlueCard claims.[3]

20.    Under the BlueCard Program, Plaintiffs submit their claims to BCBSTX (the "local" or "Host Plan") for the services they provided to a subscriber. BCBSTX then reviews the claim, determines the amount that would be payable under the Agreements for the services that Plaintiffs provided to the subscriber, and forwards the claim to the BCBS health plan that insures the subscriber or administers the subscriber's health plan (referred to as the "Home Plan"). The Home Plan then applies the subscriber's health benefits, makes coverage determinations, and either approves or denies payment for the services. BCBSTX then transmits the Home Plan's decision and payment to Plaintiffs. Importantly, the payment rates specified in the Agreements between BCBSTX and Plaintiffs govern the amount Plaintiffs are entitled to be reimbursed for the services provided to the subscriber, regardless of whether that subscriber is a participant in a BCBSTX health plan or another state's BCBS health plan. The Home Plan accesses and relies upon the rates specified in the Agreements when making payment.

21.    In the present case, BCBS AL is the Home Plan for the Subscribers. Plaintiffs rendered services to the Subscribers and submitted their claims for such services to BCBSTX for

---

[3] *See Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 814 F.3d 242, 246 (5th Cir. 2016) ("BCBSTX acts as the administrator for . . . claims arising under the BlueCard program.").

forwarding to BCBS AL through the BlueCard Program. Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected BCBS AL to reimburse them for the services provided to its Subscribers at the rates specified in the Agreements.

22.     Plaintiffs' expectations of reimbursement by BCBS AL at the rates specified in the Agreements were reinforced by BCBS AL's own conduct and representations, which are consistent with, if not express admissions of, BCBS AL being bound by the Agreements as an "Affiliate" of BCBSA and the "Payer" of claims.

23.     BCBS AL, upon information and belief, represents on its website that the Hospitals are "in-network" with BCBS AL. Specifically, BCBS AL includes a page on its website where its subscribers with BCBS AL health plans can locate care.[4] Upon information and belief, using the "Find Care" tool on BCBS AL's website reveals that the Hospitals are "in-network" with BCBS AL for the Subscribers' health plans.[5]

24.     BCBS AL's website explains the difference between "in-network" and "out-of-network" as follows: "An in-network provider is a doctor, hospital or other healthcare provider that accepts your health insurance plan. To be included in that plan, in-network providers have agreed to provide a discounted rate for their services and care. A provider or hospital that is out-of-network, on the other hand, doesn't have a contract with your health insurance company to provide discounted care."[6]

---

[4]  *See Find a Doctor*, BlueCross BlueShield of Alabama (last visited Mar. 3, 2026), https://www.bcbsal.org/web/provider-finder. A printout of the webpage is attached hereto as **Exhibit 1**.

[5] *See id*. Samples of the search results using BCBS AL's "Find Care" tool showing the Hospitals as "in-network" are attached hereto as **Collective Exhibit 2**.

[6] *See How to Find a Doctor That's In Network*, BlueCross BlueShield of Alabama (last visited Mar. 3, 2026), https://articles.bcbsal.org/how-to-find-a-doctor-thats-in-network/. A printout of the webpage is attached hereto as **Exhibit 3**.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                              **PAGE 10**

25.    BCBS AL states on its website, "BlueCard® is a national program that enables members of one BCBS Plan to obtain healthcare service benefits while traveling or living in another BCBS Plan's service area. The program links participating healthcare providers with the independent BCBS Plans across the country and in more than 200 countries and territories worldwide through a single electronic network for claims processing and reimbursement."[7]

26.    The Host Plan serves as the administrator for the subscribers' health plans when it handles claims through the BlueCard Program,[8] which is evidenced by the Host Plan charging, upon information and belief, an administration fee to the Home Plan. The Host Plan also, upon information and belief, charges an access fee to the Home Plan for access to the rates in the Host Plan's contract with the provider.

27.    Under the BlueCard Program, the Home Plan must pay for covered services provided to its subscribers at the rates specified in the Host Plan's contract with the provider.

28.    Upon information and belief, the Home Plan accounts for all payments made under the BlueCard Program for the Home Plan's subscribers as an expense on its federal taxes, evidencing the Home Plan's financial responsibility for BlueCard claims.

29.    Upon information and belief, the Host Plan and Home Plan have a direct or indirect contractual relationship relating to their participation in the BlueCard Program (i.e., the Home Plan and Host Plan may directly contract with one another to participate in the BlueCard Program, and/or participation in the BlueCard Program is a term of the licensing agreements between BCBSA and all BCBS licensees).

---

[7]    *See BlueCard Program*, BlueCross BlueShield of Alabama (last visited Mar. 3, 2026), https://providers.bcbsal.org/portal/resources/-/resources/category/45225627. A printout of the webpage is attached hereto as **Exhibit 4**.

[8] *See Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 814 F.3d 242, 246 (5th Cir. 2016) ("BCBSTX [in that case acting as a Host Plan] acts as the administrator for . . . claims arising under the BlueCard program.").

**PLAINTIFFS' ORIGINAL COMPLAINT**                                              **PAGE 11**

30.     Through this network of contracts, the BlueCard program essentially operates as a rental network.

31.     Applying the mechanics of the BlueCard Program to the present dispute, the BlueCard Program should have operated as follows: BCBS AL is the Home Plan for the Subscribers. The Subscribers received care at the Hospitals in Texas. Plaintiffs submit their claims for reimbursement for the services they provided to the Subscribers to BCBSTX. Then, BCBSTX, acting as the administrator of the Subscribers' health plans, reviews the claims, determines the amount that would be payable under the Agreements based on the services Plaintiffs provided to the Subscribers, and forwards the claims to BCBS AL for adjudication. BCBS AL, as the Home Plan, applies the Subscribers' health benefits, makes coverage determinations, and approves or denies payment for the services, at the rates set forth in the Agreements. BCBSTX then transmits the Home Plan's decisions and payments to Plaintiffs.

32.     Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected BCBS AL to reimburse Plaintiffs for the services provided to its Subscribers at the rates specified in the Agreements, which are the rates BCBS AL agreed to pay, by virtue of participation in the BlueCard Program and as an "Affiliate" of BCBSA and "Payer" under the Agreements.

33.     Additionally, for at least some of the Subscribers at issue in this dispute, Plaintiffs received correspondence or communications, including authorizations for care and decisions on appeals, directly from BCBS AL, as opposed to BCBSTX, concerning the claims at issue.

34.     BCBS AL's Subscribers received medical services from Plaintiffs through the BlueCard Program, and as an "Affiliate" of BCBSA and a "Payer" responsible for the claims associated with such care under the Agreements, BCBS AL is contractually bound by the

Agreements, including their provisions obligating "Payers" to timely and correctly pay claims at the rates set forth therein.

35.     Plaintiffs are authorized to assert the claims described herein on behalf of the Subscribers because upon admission to the Hospitals, each patient or their legal representative signs a form, often referred to as Conditions of Admission ("COA"), that includes an assignment of the patient's health insurance benefits (including an assignment of rights to pursue those benefits in litigation or in any other forms of dispute resolution in any forum for any type of relief) to Plaintiffs. The Subscribers signed these COA forms assigning their rights and benefits under their respective health plans to the Plaintiffs. These COA forms each contain the following provision or substantially similar language: "[p]atient assigns all his/her rights and benefits under existing polices of insurance providing coverage and payment for any and all expenses incurred as a result of services and treatment rendered by the Provider… I hereby irrevocably appoint the Provider as my authorized representative to pursue any claims…. and/or legal remedies."[9] Further, each of the claims at issue was submitted with a "Y" in box 53 of the claim form, indicating that the claim was submitted pursuant to an assignment of benefits. At no point during the processing of any of the claims for reimbursement at issue in the present matter did BCBS AL deny any claims based upon or raise the existence of any anti-assignment language in the Subscribers' respective health plans.

## II.     FACTS CONCERNING THE CLAIMS AT ISSUE

36.     <u>Patient 1 – Admitted in 2021 and Discharged in 2022</u>: At the time services were rendered, Patient 1 was a 34-year-old female with a history of morbid obesity and asthma who

---

[9] Copies of the COAs signed by the Subscribers, which have been redacted to protect the Subscribers' identities in accordance with The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), are attached hereto as **Collective Exhibit 5**.

presented to MC Dallas's emergency department with complaints of general malaise, intermittent fever, and body aches. Patient 1 tested positive for COVID and had worsening shortness of breath. Chest x-rays revealed that Patient 1 had COVID pneumonia, and she was admitted as an inpatient per physician order for further treatment. During her admission, Patient 1 received steroids, Remdesivir, and frequent monitoring. Patient 1 developed tachycardia and required cardiac workup and monitoring. Patient 1 also experienced edema and increased levels of dopamine, requiring additional testing/monitoring. Patient 1 experienced increased pain during her admission and required frequent doses of intravenous Dilaudid. Patient 1's medications were adjusted, and she was closely monitored. Patient 1 was slowly tapered off intravenous analgesics, and once she no longer required intravenous mediations, she was discharged home in stable condition after 49 days of inpatient admission.

37.     Patient 1 presented to MC Dallas with insurance through BCBS AL. MC Dallas periodically submitted Patient 1's medical records and interim claims for the services provided for Patient 1 to BCBSTX for forwarding to BCBS AL. BCBS AL ultimately authorized the first 13 days of Patient 1's admission, and through BCBSTX, partially paid the claim in the amount of $51,485.10. By explanation of benefits dated February 7, 2023, however, BCBSTX, on behalf of BCBS AL, denied the remainder of the claim for a purported lack of authorization and benefit maximum having been reached or exceeded.

38.     On or about February 14, 2023, MC Dallas submitted a first-level appeal to BCBSTX for forwarding to BCBS AL, enclosed a copy of Patient 1's medical records, and requested a medical necessity review. On March 8, 2023, MC Dallas learned through Availity (an online portal used by BCBSTX) that BCBS AL upheld its denial, but BCBS AL did not provide a basis for such decision.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **PAGE 14**

39.     On or about March 14, 2023, MC Dallas submitted a second-level appeal to BCBSTX for forwarding to BCBS AL, enclosed a copy of Patient 1's medical records, and requested a medical necessity review. On May 5, 2023, MC Dallas contacted BCBSTX, and a representative of BCBSTX informed MC Dallas that the appeal was under review but that the medical records had not been forwarded to BCBS AL because they were allegedly unsolicited. The BCBSTX representative also informed MC Dallas that the claim for Patient 1 was denied due to the benefit maximum having been reached, rather than for lack of authorization. From May 12, 2023, to June 16, 2023, MC Dallas contacted BCBSTX for an update on the status of the second-level appeal six times. On June 23, 2023, a representative of BCBSTX informed MC Dallas that the denial of the claim for Patient 1 was for lack of preauthorization, that Patient 1's medical records had been sent to BCBS AL for review, and to allow additional time for processing. On July 7, 2023, a representative of BCBSTX informed MC Dallas that BCBS AL did not properly review the medical records for Patient 1 and that they were being sent back to BCBS AL for review. From July 7, 2023, to August 4, 2023, MC Dallas contacted BCBSTX concerning the status of the second-level appeal four more times, and each time, a representative of BCBSTX informed MC Dallas that the appeal was still under review and additional time was needed. On August 10, 2025, BCBSTX informed MC Dallas that it had escalated the appeal with BCBS AL. On August 25, 2023, a representative of BCBSTX informed MC Dallas that BCBS AL upheld its denial on grounds that the authorization for Patient 1 only covered the first 13 days of Patient 1's admission, and the additional days were not medically necessary due to lack of clinical information.

40.     The denial of MC Dallas's claim for the services rendered to Patient 1 based on a purported lack of authorization, benefit maximum having been reached, and/or lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

41.     First, under the North Texas Agreement and federal law, MC Dallas is not required to obtain authorization for emergency and stabilization services. *See* 29 C.F.R. § 2590.715-2719A (eff. Sept. 13, 2021). Patient 1 presented to MC Dallas's emergency department while experiencing a medical emergency.

42.     Second, at least some portion of the billed services constituted emergency and post-stabilization care services for which BCBS AL is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

43.     Third, there is no indication that BCBS AL performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Dallas's request for the same. Under the North Texas Agreement, BCBS AL must pay for medically necessary, covered services even if they were not authorized.

44.     Finally, BCBS AL failed to provide any explanation supporting its denial of the services provided to Patient 1. This violates federal law, which requires a health plan to provide "[t]he specific reason or reasons for the adverse determination" and "[i]f the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." *See* 29 C.F.R. § 2560.503-1(g)(1)(i), (v)(B).) This similarly violates Texas law. *See* Tex. Ins. Code § 4201.303(a)(1)-(3) (requiring an adverse determination to include "the principal reasons for the adverse determination; the clinical basis

for the adverse determination; [and] a description of or the source of the screening criteria used as guidelines in making the adverse determination").

45.     In sum, MC Dallas provided medically necessary, covered services to Patient 1 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Dallas is entitled to $141,949.15 for the medically necessary, covered services it provided to Patient 1.

46.     <u>Patient 2 – Admitted and Discharged in 2022</u>: At the time services were rendered, Patient 2 was a 47-year-old female who presented to Rio Grande's emergency department complaining of an inability to stand or ambulate for the past 10 days. Patient 2 underwent magnetic resonance imaging of her brain, which revealed neurocysticercosis. Patient 2 was admitted as an inpatient per physician order. During her admission, Patient 2 was evaluated by Rio Grande's infectious disease and neurology teams, and she was treated with intravenous steroids, anti-parasitics, and antibiotics. Patient 2's condition continued to decline and was complicated by seizures and midline shift of her brain caused by edema. Patient 2 underwent a craniectomy and ventriculostomy. She experienced respiratory arrest and required intubation and mechanical ventilation. Patient 2 then began requiring vasopressors for blood pressure support. Patient 2's life support was ultimately withdrawn, and she passed away after 12 days of inpatient admission.

47.     Patient 2 presented to Rio Grande with insurance through BCBS AL. Rio Grande notified BCBS AL of Patient 2's admission, and BCBS AL authorized the first five days of Patient 2's admission. Rio Grande submitted a claim for the services provided to Patient 2 on February 26, 2022. By explanation of benefits dated April 4, 2022, BCBSTX, on behalf of BCBS AL, paid

$38,248.95 for the first five days of Patient 2's admission and denied the remaining eight days for lack of authorization.

48.    On or about May 4, 2022, Rio Grande submitted a first-level appeal to BCBSTX for forwarding to BCBS AL, enclosed a copy of Patient 2's medical records, and requested a medical necessity review. Rio Grande contacted BCBSTX concerning the status of the first-level appeal on May 26, 2022, and on June 1, 2022, and both times, representatives of BCBSTX informed Rio Grande that the appeal was under review. On June 30, 2022, a BCBSTX representative informed Rio Grande that BCBS AL upheld its denial for lack of authorization.

49.    On or about July 6, 2022, Rio Grande contacted BCBSTX to submit a second-level appeal, and a representative of BCBSTX sent the claim for Patient 2 to BCBS AL for reprocessing. On August 4, 2022, Rio Grande contacted BCBSTX concerning the status of the second-level appeal, and a representative of BCBSTX confirmed the appeal was sent to BCBS AL. On August 15, 2022, BCBSTX informed Rio Grande that BCBS AL upheld its denial for lack of authorization.

50.    The denial of Rio Grande's claim for services rendered to Patient 2 based on a lack of authorization constituted a wrongful denial of benefits and should be reversed.

51.    First, under the Gulf Coast Agreement and federal law, Rio Grande is not required to obtain authorization for emergency and stabilization services. *See* 29 C.F.R. § 2590.715-2719A (eff. Sept. 13, 2021). Patient 2 presented to Rio Grande's emergency department while experiencing a medical emergency.

52.    Second, at least some portion of the billed services constituted emergency and post-stabilization care services for which BCBS AL is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **PAGE 18**

53.     Third, there is no indication that BCBS AL performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite Rio Grande's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 2's medical records and supported by the fact that Patient 2's admission met InterQual criteria.[10] Under the Gulf Coast Agreement, BCBS AL must pay for medically necessary, covered services even if they were not authorized.

54.     Finally, BCBS AL suffered no prejudice as a result of any alleged lack of authorization. Rio Grande rendered medically necessary care to Patient 2, and BCBS AL has never challenged the appropriateness of the care rendered to Patient 2.

55.     In sum, Rio Grande provided medically necessary, covered services to Patient 2 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, Rio Grande is entitled to be paid $77,350.54 for the medically necessary, covered services it provided to Patient 2.

56.     Patient 3 – Admitted and Discharged in 2022: At the time services were rendered, Patient 3 was a 25-year-old male who was transferred to North Cypress's critical care unit after presenting to another facility on the previous day following an episode of cardiac arrest. Patient 3 was admitted as an inpatient at North Cypress per physician order. Patient 3 was noted to be experiencing myoclonic jerks and altered mental status upon admission. Patient 3 was evaluated and treated by cardiology during his admission. During his admission, Patient 3 developed serious complications that required further monitoring and treatment, including pneumothorax, pneumonia, cardiogenic shock, pulmonary edema, acute kidney injury requiring dialysis, liver

---

[10] InterQual criteria are guidelines used by health plans and healthcare providers as a tool to evaluate the appropriate level of care (inpatient, observation, or outpatient) for hospitalized patients. The guidelines are not determinative of medical necessity and are not a substitute for the professional medical judgment of a treating physician.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                                  **PAGE 19**

shock, ileus, thrombocytopenia, and metabolic acidosis. Once stable, Patient 3 was discharged to an inpatient rehabilitation facility.

57.    Patient 3 presented to North Cypress with insurance through BCBS AL. North Cypress notified BCBS AL of Patient 3's admission and periodically submitted updated medical records for Patient 3 to BCBS AL. By correspondence dated June 15, 2022, BCBS AL approved 14 days of inpatient admission for Patient 3 with no level of care specified. On June 16, 2022, North Cypress submitted a claim for the services provided to Patient 3 to BCBSTX for forwarding to BCBS AL. By explanation of benefits dated June 29, 2022, BCBSTX, on behalf of BCBS AL, denied the claim in full, stating "[c]overage/program guidelines were not met."

58.    On or about August 9, 2022, North Cypress submitted a first-level appeal to BCBSTX for forwarding to BCBS AL, enclosed a copy of Patient 3's medical records, and requested a medical necessity review. By explanation of benefits dated August 16, 2022, BCBSTX, on behalf of BCBS AL, denied the claim for Patient 3 for a purported lack of authorization and on grounds that the "[c]harge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement." By separate explanation of benefits dated August 16, 2022, BCBSTX, on behalf of BCBS AL, issued another denial for the claim on grounds that "[c]overage/program guidelines were not met." By yet another explanation of benefits dated September 7, 2022, BCBSTX, on behalf of BCBS AL, denied the claim as an "[e]xact duplicate claim/service."

59.    From August 31, 2021, to September 8, 2022, however, North Cypress contacted BCBSTX concerning the status of the first-level appeal four times, and each time, a representative of BCBSTX informed North Cypress that the appeal was still under review. On September 29, 2022, a representative BCBSTX informed North Cypress that the appeal had been closed in error

and that the appeal would be reopened and expedited. On October 21, 2022, a representative of BCBSTX informed North Cypress that payment for the claim had been denied based on a 100% provider sanction for alleged lack of authorization, and the representative sent the claim for Patient 3 back to BCBS AL for review. On November 1, 2022, a representative of BCBSTX informed North Cypress that BCBS AL upheld its denial on grounds that authorization for Patient 3's admission was for an acute level of care, rather than for the intensive or critical care unit. Then, by correspondence dated November 4, 2022, BCBSTX, on behalf of BCBS AL, denied the claim on grounds that another provider was allegedly paid for the same services.

60.    On or about November 8, 2022, North Cypress submitted a second-level appeal to BCBSTX for forwarding to BCBS AL, enclosed a copy of Patient 3's medical records, and requested a medical necessity review. From November 30, 2022, to January 9, 2024, North Cypress contacted BCBSTX concerning the status of the second-level appeal five times, and each time, a representative of BCBSTX informed North Cypress that the appeal was still under review. By explanation of benefits dated January 1, 2023, BCBSTX, on behalf of BCBS AL, upheld its denial in full for a purported lack of medical necessity. By separate explanation of benefits dated January 11, 2023, BCBSTX, on behalf of BCBS AL, upheld the denial for a purported lack of authorization and on grounds that the "[c]harge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement." By correspondence dated February 3, 2023, BCBSTX, on behalf of BCBS AL, stated that the claim was denied based on Patient 3's member contract and that the charges were Patient 3's responsibility.

61.    The denial of North Cypress's claim for services rendered to Patient 3 on the basis of a purported lack of authorization and/or medical necessity constituted a wrongful denial of benefits and should be reversed.

62.    First, BCBS AL authorized the services provided to Patient 3 for the dates of service at issue. BCBS AL is prohibited from denying payment for North Cypress's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f) ("If an insurer has preauthorized medical care or health care services, the insurer may not deny or reduce payment to the physician or health care provider for those services based on medical necessity or appropriateness of care."). Further, under the Gulf Coast Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

63.    Second, at least some portion of the billed services constituted emergency and post-stabilization care services for which BCBS AL is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

64.    Third, BCBS AL failed to provide any explanation supporting its denial of the services provided to Patient 3. This violates federal law, which requires a health plan to provide "[t]he specific reason or reasons for the adverse determination" and "[i]f the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." *See* 29 C.F.R. § 2560.503-1(g)(1)(i), (v)(B).) This similarly violates Texas law. *See* Tex. Ins. Code § 4201.303(a)(1)-(3) (requiring an adverse determination to include "the principal reasons for the adverse determination; the clinical basis for the adverse determination; [and] a description of or the source of the screening criteria used as guidelines in making the adverse determination").

65.     In sum, North Cypress provided medically necessary, covered services to Patient 3 and is entitled to payment in full for those services. According to the Gulf Coast Agreement, North Cypress is entitled to be paid $134,953.00 for the medically necessary, covered services provided to Patient 3.

66.     Patient 4 – Procedure Performed in 2023: At the time services were rendered, Patient 4 was a 54-year-old female who presented to Round Rock for a scheduled anterior cervical discectomy and fusion surgery for cord and disc compression and myeloradiculopathy. Patient 4 tolerated the procedure well and remained in the hospital overnight for routine post-operative monitoring. Patient 4 was discharged in stable condition the next day.

67.     Patient 4 presented to Round Rock with insurance through BCBS AL. On March 3, 2023, Round Rock submitted a claim for the services provided to Patient 4 to BCBSTX for forwarding to BCBS AL. By explanation of benefits dated March 8, 2023, BCBSTX, on behalf of BCBS AL, denied the claim in full on grounds that "[c]overage/program guidelines were not met." On March 22, 2023, a representative of BCBSTX informed Round Rock that the denial was for lack of authorization.

68.     On or about March 28, 2023, Round Rock submitted a first-level appeal to BCBSTX for forwarding to BCBS AL, enclosed a copy of Patient 4's medical records, and requested a medical necessity review. From April 18, 2023, to June 26, 2023, Round Rock contacted BCBSTX concerning the status of the appeal, and each time, Round Rock was informed that the appeal was still under review. On July 21, 2023, a representative of BCBSTX informed Round Rock that BCBS AL upheld its denial, but no further explanation was provided.

69.     On or about July 24, 2023, Round Rock submitted a second-level appeal to BCBSTX for forwarding to BCBS AL, enclosed a copy of Patient 4's medical records, and

requested a medical necessity review. On August 28, 2023, Round Rock contacted BCBSTX concerning the status of the appeal, and a representative of BCBSTX informed Round Rock that BCBS AL upheld its denial for lack of authorization.

70.     The denial of Round Rock's claim for services rendered to Patient 4 based on a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

71.     First, there is no indication that BCBS AL performed a medical necessity review on appeal, as provided for in the St. David's Agreement, despite Round Rock's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 4's medical records. Under the St. David's Agreement, BCBS AL must pay for medically necessary, covered services even if they were not authorized.

72.     Further, BCBS AL suffered no prejudice as a result of any alleged lack of authorization. Round Rock rendered medically necessary care to Patient 4, and BCBS AL has never challenged the appropriateness of the care rendered to Patient 4.

73.     In sum, Round Rock provided medically necessary, covered services to Patient 4 and is entitled to payment in full for those services. According to the terms of the St. David's Agreement, Round Rock is entitled to $45,399.78 for the medically necessary, covered services it provided to Patient 4.

74.     Patient 5 – Admitted and Discharged in 2023: At the time services were rendered, Patient 5 was a 55-year-old male with a history of metastatic stage IIIB colorectal cancer to the liver, surgical resections, radiation-induced hepatic and biliary necrosis, chronic anemia, orthostatic hypotension, biliary obstruction, chronic neuropathic pain, and recent e. Coli sepsis who presented to Round Rock's emergency department via ambulance with complaints of fever, cough, shortness of breath, nausea, and fatigue. Patient 5 was admitted as an inpatient per

physician order for treatment of sepsis with septic shock. Patient 5 was hypotensive and tachycardic; had a fever of 102.9 degrees Fahrenheit and had a respiratory rate in the 20s; and required five liters of fluids, vasopressin, steroids, and Tylenol. Patient 5's septic shock was determined to be related to an infected hepatic tumor, which was treated aggressively with multiple intravenous antibiotics and a drain. Patient 5 also required a blood transfusion during his inpatient admission due to acute anemia. Once stable, Patient 5 was discharged home with outpatient treatment in place for continued intravenous antibiotic therapy.

75.    Patient 5 presented to Round Rock with insurance through BCBS AL. Round Rock notified BCBS AL of Patient 5's admission and submitted Patient 5's medical records. By correspondence dated December 1, 2023, BCBS AL authorized the entirety of Patient 5's inpatient admission.

76.    On December 5, 2023, Round Rock submitted a claim for the services provided to Patient 5 to BCBSTX for forwarding to BCBS AL. By explanation of benefits dated December 20, 2023, BCBSTX, on behalf of BCBS AL, denied the claim in full on grounds that "[c]overage/program guidelines were not met." On December 26, 2023, Round Rock verified through a provider portal used by BCBSTX that the claim was denied for a purported lack of authorization.

77.    On or about January 5, 2024, Round Rock submitted a first-level appeal to BCBSTX for forwarding to BCBS AL, enclosed a copy of Patient 5's medical records, and requested a medical necessity review. During February of 2024, Round Rock contacted BCBSTX concerning the status of the appeal multiple times, and each time, a representative of BCBSTX informed Round Rock that the appeal was under review. By correspondence dated March 4, 2024, BCBSTX, on behalf of BCBS AL, upheld the denial on grounds that "preadmission certification

is required on elective inpatient admissions. If no precertification is obtained, no benefits are available."

78.    On or about March 12, 2024, Round Rock submitted a second-level appeal to BCBSTX for forwarding to BCBS AL, enclosed a copy of Patient 5's medical records, and requested a medical necessity review. From April 4, 2024, to May 10, 2024, Round Rock contacted BCBSTX concerning the status of the appeal and was informed each time that the appeal was under review. By explanation of benefits dated May 16, 2024, BCBSTX, on behalf of BCBS AL, upheld its denial for a purported lack of authorization. By correspondence dated May 24, 2024, BCBSTX, on behalf of BCBS AL, confirmed that the denial was upheld. On May 29, 2024, Round Rock learned that BCBS AL had applied a provider sanction for Round Rock's alleged failure to obtain authorization.

79.    The denial of Round Rock's claim for services rendered to Patient 5 based on a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

80.    First, BCBS AL authorized all dates of service for Patient 5. BCBS AL is prohibited from denying payment for Round Rock's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f) ("If an insurer has preauthorized medical care or health care services, the insurer may not deny or reduce payment to the physician or health care provider for those services based on medical necessity or appropriateness of care."). Further, under the St. David's Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

81.    Second, there is no indication that BCBS AL performed a medical necessity review on appeal, as provided for in the St. David's Agreement, despite Round Rock's request for the

same. Further, the services rendered were medically necessary as evidenced by Patient 5's medical records and supported by the fact that Patient 5's admission met InterQual criteria. Under the St. David's Agreement, BCBS AL must pay for medically, necessary covered services even if they were not authorized.

82.    Third, at least some portion of the billed services constituted emergency and post stabilization care services for which BCBS AL is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

83.    Finally, BCBS AL suffered no prejudice as a result of any alleged lack of authorization. Round Rock rendered medically necessary care to Patient 5, and BCBS AL has never challenged the appropriateness of the care rendered to Patient 5.

84.    In sum, Round Rock provided medically necessary, covered services to Patient 5 and is entitled to payment in full for those services. According to the terms of the St. David's Agreement, Round Rock is entitled to $26,023.00 for the medically necessary, covered services it provided to Patient 5.

85.    <u>Patient 6 – Admitted and Discharged in 2023</u>: At the time services were rendered, Patient 6 was a 52-year-old female who had undergone a posterior lumbar laminectomy fusion approximately one year prior in Mexico with subsequent complications, including severe pain that interfered with activities of daily living, infection, and pseudoarthrosis. Patient 6's condition had failed to be remedied with conservative treatment. Accordingly, Patient 6 presented to Stone Oak for a scheduled anterior lumbar fusion and revision lumbar fusion with removal and reinsertion of spinal fixation. Patient 6 was admitted as an inpatient for her procedure per physician order. Postoperatively, Patient 6 required treatment for posthemorrhagic anemia and

hypotension. Once she was stable, Patient 6 was discharged home after three days of inpatient admission.

86.     Patient 6 presented to Stone Oak with insurance through BCBS AL. By correspondence dated March 6, 2023, BCBS AL denied authorization for Patient 6's procedure and inpatient admission for a purported lack of medical necessity. By correspondence dated March 7, 2023, BCBS AL stated that it denied the claim because Patient 6's medical records purportedly did not show that she had a spinal fusion at least six months prior, that her previous spinal fusion had failed, or that her pain failed to be remedied by conservative treatment.

87.     On March 11, 2023, Stone Oak submitted a claim for the services provided to Patient 6 to BCBSTX for forwarding to BCBS AL. By explanation of benefits dated April 27, 2023, BCBSTX, on behalf of BCBS AL, denied the claim in full for a purported lack of medical necessity. On the same day, Stone Oak learned through a provider portal used by BCBSTX that BCBS AL's medical necessity denial was because Patient 6's procedure was performed in an inpatient, as opposed to outpatient, setting.

88.     On or about April 27, 2023, Stone Oak submitted a first-level appeal to BCBSTX for forwarding to BCBS AL, enclosed a copy of Patient 6's medical records, and requested a medical necessity review. On June 9, 2023, Stone Oak contacted BCBSTX concerning the status of the appeal, and a representative of BCBSTX informed Stone Oak that BCBS AL upheld its denial on May 24, 2023, for a purported lack of medical necessity.

89.     On or about June 12, 2023, Stone Oak submitted a second-level appeal to BCBSTX for forwarding to BCBS AL, enclosed a copy of Patient 6's medical records, and requested a medical necessity review. On June 29, 2023, BCBS AL upheld its denial for a purported lack of medical necessity.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                      **PAGE 28**

90.    The denial of Stone Oak's claim for services rendered to Patient 6 based on a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

91.    The services provided to Patient 6 were medically necessary, as evidenced by Patient 6's medical records and supported by the fact that Patient 6's admission met InterQual criteria. Patient 6's treatment also met BCBS AL's policy, Lumbar Spinal Fusion Surgery MP-517, because Patient 6 underwent a spinal fusion one year prior, her first spinal fusion failed, and she continued to experience severe, persistent pain that failed to be remedied with conservative treatment. Additionally, the medical necessity of Patient 6's inpatient admission is further corroborated by the fact that her procedure is included on the CMS Inpatient Only list per Addendum E.[11] Under the Methodist Agreement, BCBS AL is required to pay for medically necessary, covered services.

92.    In sum, Stone Oak provided medically necessary, covered services to Patient 6 and is entitled to payment in full for those services. According to the terms of the Methodist Agreement. Stone Oak is entitled to $139,431.13 for the medically necessary, covered services it provided to Patient 6.

### D.    CAUSES OF ACTION

### COUNT I – PETITION TO COMPEL ARBITRATION PURSUANT TO 9 U.S.C. § 4

93.    The foregoing paragraphs are incorporated by reference.

---

[11] The CMS Inpatient Only List is a list of medical procedures that the Centers for Medicare & Medicaid Services ("CMS") will only cover if they are performed in an inpatient hospital setting. The Inpatient Only List ensures that complex or high-risk procedures are performed in a safe and monitored environment and prevents these procedures from being performed in outpatient settings, such as surgery centers or doctor's offices where medically necessary support may not be available. While the Inpatient Only List is only applicable to claims made to CMS, it is often used as an industry-wide guide to assess which claims are sufficiently complex such that they should only be performed on an inpatient basis.

94.    The Agreements between and among Plaintiffs and BCBS AL are valid and enforceable.

95.    The Agreements contain valid and enforceable arbitration clauses.

96.    BCBS AL has not agreed to arbitrate pursuant to the arbitration clauses contained in the Agreements.

97.    BCBS AL is, however, bound to the terms of the Agreements (as stated herein), including the arbitration clauses, and BCBS AL should therefore be compelled to arbitrate pursuant to the Federal Arbitration Act. *See* 9 U.S.C. § 4.

### COUNT II – BREACH OF CONTRACT (AGREEMENTS)

98.    The foregoing paragraphs are incorporated by reference.

99.    As alleged above, Plaintiffs are parties to the Agreements, which provide the terms and conditions under which Plaintiffs will treat subscribers with BCBS health plans and be reimbursed for that treatment.

100.    Specifically, BCBS AL is bound by the Agreements for three reasons: (1) as an "Affiliate" of BCBSA under the Agreements; (2) as a "Payer" under the Agreements; and (3) by reason of its participation in the BlueCard Program, through which, upon information and belief, it enters into contracts with BCBSTX and/or BCBSA, which should be construed as one contract with Plaintiffs' Agreements with BCBSTX.

101.    With respect to claims processed by BCBSTX for BCBS AL under the BlueCard Program, BCBS AL is both an "Affiliate" and a "Payer" under the Agreements. Accordingly, and as expressly provided in the Agreements, BCBS AL is bound by the terms of the Agreements, including their payment terms.

102.    The Agreements specifically allow "Affiliates" of BCBSA and particularly, other BCBS plans through the BlueCard Program, access to the benefits of the Agreements (namely, in-network reimbursement rates), provided the "Affiliates" comply with all terms and provisions of the Agreements. Further, the Agreements specifically provide that Plaintiffs will provide covered services to subscribers of "Affiliates," which includes BCBS AL, as set forth in and subject to the terms and conditions of the Agreements.

103.    BCBS AL, by its conduct in processing the claims, issuing partial payment on some of the claims, and authorizing the care provided in some of the claims, did in fact access and rely upon the Agreements. As an "Affiliate" of BCBSA which has accessed and relied upon the Agreements, and acted as an assignee of the Agreements, BCBS AL is bound by the terms of the Agreements for the services at issue provided by Plaintiffs to the Subscribers.

104.    BCBS AL is also a "Payer" under the Agreements because, upon information and belief, BCBS AL and BCBSTX contract directly or indirectly with one another to participate in the BlueCard Program, and under the BlueCard Program, BCBS AL is financially responsible for claims for which BCBSTX serves as administrator. BCBS AL's acknowledgement of its financial responsibility for the claims is supported by correspondence, partial payments, claims and appeals decisions, and authorizations received from BCBS AL for the Subscribers, as well as by the fact that the Home Plan accounts, upon information and belief, for payments made for claims processed under the BlueCard Program as expenses on its federal taxes. BCBSTX serving as administrator for the health plans for claims processed through the BlueCard Program is evidenced by the fact that, upon information and belief, the Host Plans charge an administration fee to the Home Plans for BlueCard claims. Under the Agreements, "Payers" are bound by the terms of the Agreements, including their payment terms, to the same extent as BCBSTX.

105.    BCBS AL's intent to be bound by the terms of the Agreements is also demonstrated by the representations made by BCBS AL to its subscribers and to providers. Specifically, BCBS AL represents that the Hospitals are "in-network" with BCBS AL, and BCBS AL explains that in-network providers have a contract with BCBS AL.

106.    Additionally, upon information and belief, the BlueCard program operates by all individual state licensees of the BCBSA entering into contracts with one another and/or with the BCBSA that allow licensees, such as BCBS AL, nationwide access to in-network reimbursement rates of other BCBS health plans, such as BCBSTX, for the licensees' members who receive medical services while living or traveling outside of the geographic boundaries of the Home Plan that issues the policy. Upon information and belief, each licensee must make its in-network rates available to all other BCBS-branded plans. The Host Plan charges the Home Plan an access fee for access to the local rates and an administrative fee for processing claims. In effect, these nationwide contracts provide a means by which individual licensees of the BCBSA, such as BCBSTX, assign their rights and locally negotiated payment rates under contracts with health care providers, such as Plaintiffs, to other licensees of the BCBSA, such as BCBS AL, thus allowing those licensees access to in-network rates, including the substantial discounts off of billed charges built into such rates, under those contracts. The assigning BCBSA licensee, which in this case is BCBSTX, then acts as the claims administrator and forwards the claims to the Home Plan, which in this case is BCBS AL, for final determination and payment, for which the Home Plan is also obligated.

107.    Under this arrangement, the BlueCard Program is essentially a rental network.

108.    Accordingly, Plaintiffs contract with BCBSTX, and, upon information and belief, BCBSTX contracts with BCBS AL (directly or indirectly through the BCBSA) to grant BCBS

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **PAGE 32**

AL access to the negotiated rates and terms between Plaintiffs and BCBSTX as set forth in the Agreements.

109.    Under Texas law, when there are multiple contracts between multiple parties in the rental network context, courts have construed the agreements as one contract between the multiple parties.

110.    In this case, the Agreements between the Hospitals and BCBSTX and the agreements between BCBSTX and BCBS AL, whether direct or indirect through the BCBSA, should be construed as one contract, such that BCBS AL is bound by the terms of BCBSTX's Agreements with the Hospitals.

111.    BCBS AL knew that by participating in the BlueCard Program with BCBSTX that it would be bound by the terms of BCBSTX's contracts with its local providers, like the Hospitals, which is evidenced by the Agreements' express references to "Affiliates" and "Payers" being bound by the terms of the Agreements.

112.    Accordingly, there was a meeting of the minds between Plaintiffs and BCBS AL as to the binding nature of the Agreements, as well as the material terms of the Agreements as they relate to both parties.

113.    Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary, covered services to a subscriber.

114.    Plaintiffs provided medically necessary, covered services to each of the Subscribers, and those services are payable under the terms of the Agreements.

115.    BCBS AL breached the Agreements by failing to pay in full for the medically necessary, covered services Plaintiffs provided to the Subscribers described above.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                                      **PAGE 33**

116.    Plaintiffs suffered damages as a direct and proximate result of BCBS AL's breach of the Agreements; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $565,106.60 under the Agreements for the medically necessary, covered services that Plaintiffs provided to BCBS AL's Subscribers.

### COUNT III – BREACH OF IMPLIED-IN-FACT CONTRACT

117.    The foregoing paragraphs are incorporated by reference.

118.    Alternatively, if BCBS AL is not bound by the terms of the Agreements as an "Affiliate" of BCBSA or as a "Payer," Plaintiffs are entitled to be reimbursed for the services provided to the Subscribers pursuant to an implied-in-fact contract existing between Plaintiffs and BCBS AL by reason of BCBS AL's participation in the BlueCard Program.

119.    As participants in the BlueCard Program, Plaintiffs and BCBS AL impliedly agreed and understood that: (1) Plaintiffs would provide services to BCBS AL's subscribers, (2) Plaintiffs would submit claims to BCBSTX, BCBS AL's agent, for forwarding to BCBS AL for services provided to the subscribers, and (3) BCBS AL would reimburse Plaintiffs at the rates specified in Plaintiffs' Agreements with BCBSTX.

120.    By participating in the BlueCard Program, BCBS AL, as an "Affiliate" of BCBSA and as a "Payer," was obligated to reimburse Plaintiffs at the rates set forth in the Agreements, even if BCBS AL was not a signatory to the Agreements.

121.    BCBS AL's intent to be bound by an implied-in-fact contract with Plaintiffs is also evidenced by BCBS AL's conduct. BCBS AL participated in the adjudication of these claims, authorized the care to be provided for some of the claims, issued partial payments, and reviewed and adjudicated appeals.

122.    BCBS AL's intent to be bound by an implied-in-fact contract with Plaintiffs is also demonstrated by the representations made by BCBS AL to their subscribers and local providers. Specifically, BCBS AL represents that the Hospitals are "in-network" with BCBS AL, meaning it has a contract with Plaintiffs.

123.    Accordingly, there was a meeting of the minds between Plaintiffs and BCBS AL as to the binding nature of the implied-in-fact contract, as well as the material terms of the contract as they relate to both parties.

124.    Plaintiffs and BCBS AL understood BCBS AL to be bound to reimburse Plaintiffs according to the terms of the Agreements by reason of its participation in the BlueCard Program and by BCBS AL's own conduct and representations.

125.    In reliance on the implied-in-fact contract formed between Plaintiffs and BCBS AL by reason of their participation in the BlueCard Program, Plaintiffs provided medical services to BCBS AL's Subscribers with the expectation that BCBS AL would reimburse Plaintiffs for such services according to the terms of the Agreements.

126.    By denying claims for services provided by Plaintiffs to BCBS AL's Subscribers, BCBS AL has breached the implied-in-fact contract existing between Plaintiffs and BCBS AL.

127.    Plaintiffs have suffered damages as a direct and proximate result of BCBS AL's breach of the implied-in-fact contract; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $565,106.60 for the medically necessary, covered services Plaintiffs provided to BCBS AL's Subscribers.

**COUNT VI – FAILURE TO COMPLY WITH HEALTH BENEFIT PLAN IN VIOLATION OF ERISA**

128.    The foregoing paragraphs are incorporated by reference.

129.    As explained above, Plaintiffs provided medically necessary covered services to the Subscribers described above, all of whom are BCBS AL's subscribers. Plaintiffs are therefore entitled to be paid the amounts due under the Agreements for that care.

130.    BCBS AL is an "Affiliate" of BCBSA and a "Payer" under the Agreements, and the Agreements apply to Plaintiffs' treatment of BCBS AL's subscribers. Upon information and belief, Plaintiffs are also entitled to payment under the terms of each Subscriber's health plan, because the Hospitals' services were medically necessary covered services that are covered by each Subscriber's health plan.

131.    Upon information and belief, some of the Subscribers whose hospital admissions are at issue are Subscriber(s) to an employer-sponsored health insurance policy that BCBS AL administers or underwrites. Thus, ERISA governs those health plans.

132.    Plaintiffs are entitled to enforce the terms of the Subscribers' health plans as the Subscribers' assignee under 29 U.S.C. § 1132(a)(1)(B). Upon admission to the Hospitals, each patient (or their legal representative) signs a COA form, which includes an assignment of the patient's health insurance benefits (including an assignment of rights to pursue those benefits) to Plaintiffs. Each of the claims at issue was submitted with a "Y" in box 53 of the claim form, indicating that the claim was submitted pursuant to an assignment of benefits.

133.    When Plaintiffs appealed each of the wrongful denial of benefits described above, they requested copies of the relevant health plan documents along with a statement of the plan's review procedures and time limits applicable to such review procedures, including any contractual limitations and any plan provisions upon which BCBS AL relied for its denial. BCBS AL did not

provide the requested health plan documents, plan provisions, or otherwise advise Plaintiffs of contractual limitations or other relevant provisions from the health plan documents at any point during the claims adjudication or appeals process. BCBS AL did not inform Plaintiffs of any purported anti-assignment provisions in the Subscribers' benefit plans.

134.    As explained above, Plaintiffs provided medically necessary services to each of the Subscribers at issue. Upon information and belief, those services qualify as covered services under the Subscribers' health plans, and BCBS AL is therefore obligated to pay Plaintiffs for those services.

135.    As explained above, BCBS AL failed to pay Plaintiffs for the covered services that it provided to the Subscribers. BCBS AL's wrongful denial of benefits for the medically necessary hospital services that Plaintiffs provided to these Subscribers breached the terms of each Subscriber's health plan, under which Plaintiffs have standing to sue through the Subscribers' assignments of benefits and rights via the COA forms that they (or their legal representative) executed upon admission to the Hospitals.

136.    As a proximate result of BCBS AL's breach of these Subscribers' health plans, Plaintiffs have been damaged in an amount in excess of the jurisdictional requirements of this Court. Plaintiffs are entitled to recover payment in an amount not less than $565,106.60 for the medically necessary covered services they provided to these Subscribers as set forth above.

### COUNT V – BREACH OF CONTRACT (FOR PLANS NOT SUBJECT TO ERISA)

137.    The foregoing paragraphs are incorporated by reference.

138.    Alternatively, Plaintiffs provided medically necessary covered services to each of the Subscribers at issue, and those services are, upon information and belief, covered under the terms of each Subscriber's respective health plan. To the extent that any of those health plans are

not subject to ERISA, Plaintiffs are entitled to recover payment under the plan under a common law claim for breach of contract.

139.    Each health plan is a contract between the Subscriber and BCBS AL, under which BCBS AL agrees to pay for medically necessary, covered services that the Subscriber receives. Plaintiffs have standing to sue for breach of contract for BCBS AL's failure to pay for the Subscribers' hospital treatment because each Subscriber assigned their benefits and rights under the health plan to Plaintiffs by executing the COA forms. Each of the Hospitals' claims for the services provided to the Subscribers indicated that it was being submitted pursuant to an assignment of benefits.

140.    Plaintiffs performed their obligations under the Subscribers' health plans by providing medically necessary covered services to each Subscriber.

141.    BCBS AL breached each of the Subscribers' health plans by failing to issue payment to Plaintiffs at the rates set forth in the Agreements for the medically necessary covered services that Plaintiffs provided.

142.    Plaintiffs suffered damages due to BCBS AL's breach of each Subscriber's health plan; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $565,106.60 under the Agreements for the medically necessary covered services that Plaintiffs provided.

COUNT VI – PROMISSORY ESTOPPEL

143.    The foregoing paragraphs are incorporated by reference.

144.    As stated above, with respect to some of the claims at issue in this dispute, BCBS AL authorized the services rendered by Plaintiffs to the Subscribers, and BCBS AL promised to reimburse Plaintiffs in accordance with the terms of the Agreements.

145.    Plaintiffs reasonably relied upon BCBS AL's authorizations as promises to pay the rates set forth in the Agreements for the services provided to its Subscribers and continued to provide such services to the Subscribers.

146.    BCBS AL knew or reasonably should have known that Plaintiffs would rely on its promises to pay the rates set forth in the Agreements for the services that Plaintiff provided to the Subscribers because BCBS AL agreed to comply with the provisions of the Agreements by accessing their terms and negotiated rates under the BlueCard Program, including the provisions prohibiting BCBS AL from denying payment for claims it authorized.

147.    BCBS AL also agreed to comply with other provisions of the Agreements prohibiting BCBS AL from denying payment for claims for other prohibited reasons, including requiring authorization for emergency services and denying payment for unauthorized services that were nonetheless medically necessary.

148.    BCBS AL knowingly accessed the Agreements as an "Affiliate" and "Payer" by participating in the BlueCard Program, thereby promising to comply with the Agreements' terms and conditions, including their payment terms.

149.    Plaintiffs reasonably relied on BCBS AL's promises to comply with the terms of the Agreements, and in reliance on BCBS AL's promises, Plaintiffs provided medical services to BCBS AL's Subscribers and submitted claims to BCBSTX for forwarding to BCBS AL for those services.

150.    BCBS AL failed to reimburse Plaintiffs as required by the terms of the Agreements. Additionally, as set forth above, with respect to some Subscribers, BCBS AL denied claims based on reasons expressly prohibited by Agreements, despite promising not to do so.

151.     Injustice to Plaintiffs can be avoided only if BCBS AL's promises to pay the rates set forth in and in accordance with the terms of the Agreements for the services Plaintiffs provided to the Subscribers is enforced.

152.     Plaintiffs' reliance on BCBS AL's promises to pay the rates set forth in and in accordance with the terms of the Agreements for the services Plaintiffs provided to the Subscribers resulted in Plaintiffs suffering monetary damages within the jurisdictional limits of this Court. Accordingly, there is now due, owing, and unpaid from BCBS AL to Plaintiffs an amount to be proven at trial for the services provided by Plaintiffs to the Subscribers that were authorized by BCBS AL and/or denied for reasons prohibited by the Agreements.

### CONDITIONS PRECEDENT

153.     All conditions precedent have been performed or have occurred.

### ATTORNEYS' FEES

154.     The foregoing paragraphs are incorporated by reference.

155.     Plaintiffs are entitled to an award of attorneys' fees under 29 U.S.C. § 1132(g) and Tex. Civ. Prac. & Rem. Code §§ 38.001.

### JURY DEMAND

156.     Plaintiffs hereby demand a trial by jury of the above-styled action for all claims for which a jury is available.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Columbia Hospital at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas; Columbia Rio Grande Healthcare, L.P. d/b/a Rio Grande Regional Hospital; KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare North Cypress; St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's Round Rock Medical Center; Methodist Healthcare

System of San Antonio, Ltd., L.L.P. d/b/a Methodist Hospital Stone Oak, hereby request that Defendant, Blue Cross and Blue Shield of Alabama, be cited to appear and answer this Complaint, and that upon final trial and determination thereof, that judgment be entered in favor of Plaintiffs, awarding them the following relief:

A. The amount due under the Agreements and the terms of each Subscriber's respective health plan;

B. Reasonable attorneys' fees and court costs; and

C. Such other and further relief to which Plaintiffs may be entitled.

Dated: March 10, 2026.

Respectfully submitted,

POLSINELLI PC

*/s/ Adam D. Chilton*
Adam D. Chilton
TX State Bar No. 24092255
POLSINELLI PC
Old Parkland – Resolute Tower
4020 Maple Avenue, Suite 300
Dallas, Texas 75219
Telephone: (214) 661-5515
Facsimile: (214) 279-2335
adam.chilton@polsinelli.com

*Counsel for Plaintiff*

**PLAINTIFFS' ORIGINAL COMPLAINT**                    **PAGE 41**